David Lingle ("Cusachs"), *Pro Se*,
3948 3rd St S #268
Jax Bch, FL 32250
LingleDavid@gmail.com
(904) 916-7100

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

CUSACHS,[1] *Pro Se*

      Plaintiff,

   vs.

SHER GARNER CAHILL RICHTER KLEIN
& HILBERT LLC, JAMES M. GARNER,
JOSHUA S. FORCE, STUART B. KOTTLE

      Defendants.

CIVIL ACTION

CASE: 26-261

SECTION: SECT. O MAG. 4

**COMPLAINT FOR DAMAGES**

**RIGHT TO TRIAL BY JURY RESERVED**

      Plaintiff David Lingle ("Plaintiff" or "Cusachs") is the great grandson of Gaspar Cusachs, the original owner of the Cusachs Collection (the "Collection"), parts of which the conspiratorial acts that form the basis of this lawsuit were designed to effectively steal from Plaintiff, the current and sole owner of the Collection. Plaintiff brings this action on behalf of himself, against Sher Garner Cahill Richter Klein & Hilbert LLC, James M. Garner, Joshua S. Force, and Stuart D. Kottle (collectively "Defendants"). Plaintiff alleges the following facts, which are true, correct, and based upon his personal knowledge, which he is fully competent to testify about.

### STATEMENT: GENERAL NATURE OF THE ACTION

1.    Defendants are a New Orleans law firm and their attorneys, who serve as defendants' counsel for the State of Louisiana and its representatives (together, the "State") in *Cusachs v. State*, 2024-02085 (Orleans Parish Civil District Court, "Parish Court"). After Plaintiff filed *Cusachs v. State*, Defendants began conspiring with their clients, the State, and significantly increased a pattern of

---

[1] Plaintiff's matrilineal surname and nickname is "Cusachs". David Lingle is a.k.a. David Cusachs. Cherilyn Sarkisian litigated under her stage name in *Cher v Forum*, 692 F 2d 634 (9th Cir 1982).

unlawful behavior to do the very things that *Cusachs v. State* was originally filed to stop happening.[2]

2.      As a part of conspiring with and assisting the State to essentially steal Plaintiff's property and/or the dollar value of that property, Defendants (a) concealed and withheld public records to prevent Plaintiff from gathering evidence to prove his *Cusachs v. State* claims, (b) publicly defamed him before the Parish Court trier of fact to negatively impact her opinion of him and his case, and (c) pled other false facts and law to mislead the Parish Court and fraudulently obstruct justice.

3.      While this case is heavily-based on the conspiratorial acts of Defendants to knowingly assist the State to repeatedly violate La RS 44:1 *et seq.* (Louisiana's Public Records Law) by refusing to properly respond to public records requests and withhold/conceal public records, in the course of doing so, Defendants also committed mail and wire fraud under 18 USC §§ 1341 and 1343 by withholding/concealing material information (including public records) and disseminating materially false information orally and in writing, through telephone/cellphone, internet upload/download, commercial and general mail/email, and other delivery methods. In doing so, Defendants conspired to and engaged in honest services fraud under 18 USC § 1346, by assisting the State to subvert its duty, which is fiduciary, in relation to their public use of Plaintiff's privately-owned Collection. Defendants' acts were part of an intentional, calculated scheme and conspiracy to obstruct justice, which unlawfully interfered the facts and evidence of the case and ultimately misled court officials (and, therefore, the judicial proceedings) in *Cusachs v. State*.[3]

4.      In violation of 18 U.S.C. § 1961, *et seq.* (the Racketeer Influenced and Corrupt Organizations Act, "RICO Act"), Defendants engaged in a coordinated pattern of racketeering activity that was

---

[2] "A lawyer shall not counsel a client to engage, *or assist* a client, in conduct that the lawyer knows is criminal or fraudulent". Rules of Professional Conduct, Rule 1.2(d), American Bar Association and Louisiana Bar Association. See also ROPC, Rules 5.1, 8.3, 8.4.

[3] Defendants acts were effectively, a civil violation of criminal statute, such as RS 14:130.1(A)(1) (a-b) (obstruction of justice), 14:132 (injuring public records), 14:133 (filing or maintaining false public records), 14:133.1 (obstruction of court orders), and 14:134 (malfeasance in office).

criminal in nature, deliberate, sustained, and directed from the highest levels of Sher Garner Cahill Richter Klein & Hilbert LLC ("Sher Garner"), along with the highest levels of the State of Louisiana (the "State") and/or Louisiana's Department of Culture Recreation and Tourism (the "DCRT"). The predicate acts involved were not isolated. They were highly-orchestrated and systemic, forming an unlawful scheme and conspiracy to "save face", preserve power and money, punish dissent, and defraud numerous artifact lenders for the Louisiana State Museum (the "State Museum") operations.

5.    Moreover, in the midst of all the aforesaid unlawful acts, Defendants attempted to shift the narrative of *Cusachs v. State* by rabidly, personally attacking Plaintiff with allegations that he criminally positioned himself to file *Cusachs v. State* and was engaged in the unlawful practice of law, among many other knowingly-untrue and defamatory, including defamatory *per se*, statements that have severely damaged and otherwise negatively impacted Plaintiff.[4]

## JURISDICTION AND VENUE

6.    Jurisdiction is proper in this Court over all claims pursuant to 28 U.S.C. § 1332(a)(1) because the parties are completely diverse and damages exceed $75,000.00. Plaintiff is domiciled in and resides in Florida, and Defendants are domiciled in and reside in Louisiana. This Court also has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, because Plaintiff's claims arise under the RICO Act, 18 U.S.C. § 1961 *et seq*.

---

[4] **CAUSES OF ACTION: (1)** Defamation, La CC Art 2315, **(2)** Fraud, 18 USC §§ 1341, 1343, 1346 [alternatively La CCP Art 1953], **(3)** Obstruction of Justice, La CC Art 2315, **(4)** Negligent Infliction of Emotional Distress, La CC Art 2315, **(5)** Violation of Louisiana Public Records Law, La RS 41:1 *et seq.*, **(6)** Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO Act"), 18 U.S.C. § 1961 *et seq.* [alternatively Violation of the Louisiana Racketeering Act, La RS 15:1351, *et seq.*], **(7)** Civil Conspiracy, 18 USC § 1349 / La CC Art 2324. Causes of action 1-6 include a conspiracy between each defendant and the defendants in *Cusachs v. State*. Defendants are also notified of Conspiracy to Commit Conversion and Unjust Enrichment as applicable causes of action. "So long as the facts constituting the claim or defense are alleged or proved, the party may be granted any relief to which he is entitled under the fact pleadings and evidence." *Greemon v. Bossier City, 2010-2828*, 65 So. 3d 1263, 1268 (La. 2011).

7.    This Court has personal jurisdiction over Defendants because they each have longstanding contacts with Louisiana and intentionally availed themselves of the laws of Louisiana by residing in and transacting a substantial amount of business in the Eastern District of Louisiana, including but not limited to providing legal services there, which both directly and indirectly led to the acts underlying each of the causes of action set forth herein and Plaintiff's resultant injuries.

8.    Venue is proper under 18 U.S.C. § 1965(a), as Defendants reside in, are found in, have agents in, and/or transact significant affairs in the Eastern District of Louisiana. Moreover, venue is also proper pursuant to 28 U.S.C. § 1391(b)(1) and (2) because of Defendants' residence and that the majority of events giving rise to this action occurred in the Eastern District of Louisiana.

## PARTIES

9.    **Plaintiff David Lingle** ("Cusachs") is a natural person over the age of majority, who is domiciled the State of Florida and before the Court in his individual capacity to defend his own legal interests and rights.

CONTACT: 3948 3rd St S #268 Jax Bch, FL 32250 LingleDavid@gmail.com (904) 916-7100.

10.    **Defendant Sher Garner** Cahill Richter Klein & Hilbert LLC is a Louisiana-incorporated limited liability company, with its registered office in the Parish of Orleans, State of Louisiana and sufficient activity in the Eastern District of Louisiana to subject it to personal jurisdiction there.

CONTACT: 909 Poydras St, 28th Floor  N.O., LA 70112 (504) 299-2100

11.    **Defendant James M. Garner** is a natural person over the age of majority, who is domiciled within the boundaries of the Eastern District of Louisiana and has sufficient presence and activity there to subject him to this Court's personal jurisdiction. He is sued individually and in his official capacities as a partner, managing member, and employee of Sher Garner. Mr. Garner is enrolled as and acts as the senior defense counsel in *Cusachs v. State*.

CONTACT: 909 Poydras St, 28th Floor  N.O., LA 70112 (504) 299-2100 jgarner@shergarner.com

12. **Defendant Joshua S. Force** is a natural person over the age of majority, who is domiciled within the boundaries of the Eastern District of Louisiana and has sufficient presence and activity there to subject him to this Court's personal jurisdiction. He is sued individually and in his official capacities as a partner and employee of Sher Garner. Mr. Force is enrolled as and acts as the second-most-senior defense counsel in *Cusachs v. State*.

CONTACT: 909 Poydras St, 28th Floor  N.O., LA 70112 (504) 299-2100 jforce@shergarner.com

13. **Defendant Stuart D. Kottle** is a natural person over the age of majority, who is domiciled within the boundaries of the Eastern District of Louisiana and has sufficient presence and activity there to subject him to this Court's personal jurisdiction. He is sued individually and in his official capacities as a partner and employee of Sher Garner. Mr. Kottle is enrolled as and acts as defense counsel and the primary defense litigator in *Cusachs v. State*.

CONTACT: 909 Poydras St, 28th Floor  N.O., LA 70112 (504) 299-2100 skottle@shergarner.com

## CENTRAL FACTS SUPPORTING CASE

14. In 1908, the State "solicited" Plaintiff's great grandfather, Gaspar Cusachs Sr. (1855-1929), for a "loan" of the Cusachs Collection (the "Collection"), a large group of historical artifacts related to Louisiana's earliest years as a U.S. territory and state.[5] From 1908 through 1939 Plaintiff's family deposited thousands of artifacts with the State Museum and were one of its "most active and generous benefactors".[6] (A *New Orleans Item* newspaper article quoted Gaspar Cusachs disclosing in 1921 that there were "5,000 pieces" in the loaned Collection.)[7]

---

[5] **NOTES:** *The term "loan" is used colloquially and very loosely herein to describe the transaction between the parties, even though it legally was/is a "mandate". CC Art 2989.* All pleading references herein are to pleadings in *Cusachs v. State*, 2024-02085; 10/16/24 Affidavit ¶ 4 and Exhibit AB (Dec 7, 1908 LSM Board Meeting Minutes, "solicitation" by Dr. Stubbs).

[6] 02/07/25 Omnibus MSJ, Exhibit 128 (Jul 19, 1971 Letter, Director Peggy Richards to Cusachs).

[7] 12/06/24 Public Records Law Post Hearing Brief, Exhibit P34 (May 15, 1918 *New Orleans Item*, "Gadzooks, I'll Cashier You, said Thompson--Cusachs"); also see next footnote.



"Cusachs Room" (1910-1912 Louisiana State Museum Biennial Report of the Board of Curators)[8]

15.     The Collection remained loaned and a part of public exhibitions, primarily in the "Cusachs Room" of the State Museum, for over a century. In January 2015, Plaintiff began to suspect the State was defrauding him.[9] So, he made specific public records requests to clarify matters.[9] In doing so, Plaintiff uncovered that, *over the prior decade*, The State had concealed public records and given fraudulent accountings to hide that thousands of Collection artifacts had been lost, stolen, destroyed/damaged, and unlawfully converted to the State's own ownership.[10]

16.     On January 30, 2015, the State finally admitted its flagrant misconduct by providing Plaintiff its "Cusachs Total Loans" inventory (which combined its decades-old "Cusachs Found" and "Cusachs Not Found" inventories).[11] Previous to that, the State only disclosed its Cusachs Found inventory to Plaintiff and fraudulently attempted to dupe him out of his right to compensation by demanding that he sign a contract (a) agreeing their fraudulent inventory was

---

[8] 02/07/25 Omnibus MSJ, p. 6, Exhibits 44-47 (Third Biennial Report of Curators, Jul 3, 1911 and October 2, 1911 Board Meeting Minutes, Mar 10, 1907 Times Picayune).
[9] 06/02/25 Post-Hearing Brief, Exhibit 31 (Sep 14, 2015 termination follow up letter); 02/07/25 Omnibus MSJ, Exhibits 71-72 (Jan 28, 2015 email Lingle to Wheat; 06/17/24 FAP ¶¶ 90-111.
[10] 02/07/25 Omnibus MSJ, §§ 3, 6 (pp. 3-5, pp. 8-11). Also, 06/17/24 FAP ¶¶ 90-111.
[11] 02/07/25 Omnibus MSJ, Exhibit 73 (Jan 30, 2015 email Dalia to Lingle); 06/17/24 FAP ¶¶ 90-111; 06/02/25 Post-Hearing Brief, p3 ("Cusachs Found"/ "Cusachs Not Found").

correct and (b) waiving his rights to sue for anything they had done in the past, present, or future.[12]

17.    The State relentlessly "pitched" its contract to Plaintiff as a demand for a bribe. Give me indemnity by signing the contract or you will not get any artifacts back.[13] Plaintiff refused to sign the contract and threatened to sue if the State did not return his artifacts.

18.    In March 2016, the State only was able to return roughly 600 of the roughly 5,000 artifacts documented as loaned.[14] Thereafter, the State expressly represented it was committed to a "complete resolution" of "all matters" by continuing its "efforts to complete the return of the loaned items to [Plaintiff] and resolution of those matters associated with the loaned items."[15]

19.    By April 2017, though, the State informed Plaintiff that the remaining searches for Collection artifacts were "suspended" because all senior members of the State Museum had been fired or suddenly resigned. Yet, the State still offered to "take another look" at other issues. That comforted Plaintiff and added more rationale for him to detrimentally rely on its representations about seeking a complete resolution. Plaintiff reasonably figured that the State would restart the searches when it was reorganized and had the right people in place to continue.

20.    After sporadically speaking with the State over the next five years, in February 2023, Plaintiff decided that it was time for him to seek a final resolution to the outstanding Collection issues by following up with the State. After repeated follow up by Plaintiff, on April 5, 2023, the State finally replied,

> all matters involving the Cusachs collection were resolved in 2016 … All Cusachs objects which could be located were returned … ***None were retained*** … [on May 3, 2023, the State added,] we do view this matter as closed.[16]

---

[12] 02/07/25 Omnibus MSJ, Exhibits 64-70 (Settlement Agreement).
[13] 10/23/24 Affidavit, Exhibit P13 (Sep 29, 2013 email Dalia to Lingle); 06/17/24 FAP ¶¶ 92-93.
[14] 09/26/24 Opposition, p. 2 (600 items located and returned); also see fn. 6.
[15] 02/07/25 Omnibus MSJ, Exhibit 7 (Jun 6, 2016 email Moore to Lingle).
[16] 02/07/25 Omnibus MSJ, Exhibits 75-75 (Apr 5, 2016 email Dalia to Lingle).

**PLAINTIFF'S ORIGINAL PUBLIC RECORDS REQUESTS**

21.     Over the next months, Plaintiff continued to reach out and politely engage the State. It refused to materially respond.[17] So, on October 25, 2023 Plaintiff made a public records request, seeking to show the State its records prove it has more Collection artifacts. That same day, the State set the next day, at 1 p.m., for an examination.[18] Plaintiff's examination raised new issues.

22.     So, on November 9, 2023, Plaintiff made another public records request to clarify those issues. The State vaguely responded the next day only to indicate it would see if it could locate the requested records.[19] After two months of delay, without update, on January 2, 2024, Plaintiff followed up and made an additional request.[19] The State did not respond at all to Plaintiff's January 2 public records request and emailed effort to follow up about his November 9 request.[19] So, Plaintiff followed up again on January 21, 2024 and made a third request, to which the State, once again, only gave a vague response: we "will advise you when they are available."[19]

23.     In January 2024, Plaintiff realized the State's lack of response was a legal strategy to delay matters past the 1-year prescription deadline from their April 5, 2023 notice "all matters involving the Cusachs collection were resolved in 2016."[20] As a result, he began drafting a lawsuit, hoping to use it to prod the State to move forward with resolution of the Collection matter.

24.     On February 14, 2024, Plaintiff informed the State he had a lawsuit prepared and was set to file it. Two days later, on February 16, the State replied with a *mea culpa* of sorts:

> [G]ood news … it came to light that approximately 29 additional Cusachs artifacts have been found. We want to return those artifacts to you.

25.     So, on February 20, 2024, Plaintiff made a public records request for a list of the 29 artifacts

---

[17] 10/23/24 Affidavit, Exhibit P26 (October 5, 2023 email Lingle to Dalia); FAP ¶¶ 133-140.
[18] 10/23/24 Affidavit, Exhibit P27 (October 25, 2023 email McKnight to Lingle).
[19] 01/10/24 Public Records Law Reasons for Judgment; FAP ¶¶ 275-280.
[20] 02/07/25 Omnibus MSJ, Exhibit 82 (01/15/24 Exception Memo, p. 6); also see fn. 15.

that had allegedly just been found. The State refused to produce the list or the artifacts.

26.    As a result, Plaintiff sued and the State appointed Defendants as legal counsel to assist it. Thereafter, with Defendants' conspiring with and assisting it, the State brazenly just continued to completely ignore public records requests, as if Louisiana Public Records Law did not apply to it.

### PLAINTIFF'S APRIL 11, 2024 PUBLIC RECORDS REQUEST

27.    In *Cusachs v State*, Plaintiff originally served discovery and public records requests by postal mail on April 9, 2024, which was received by Lieutenant Governor Billy Nungesser on April 11, 2024. The words in paragraph 25 of the discovery "Instructions and Definitions" stated:

> **This discovery is a form of public records request to YOU.** Please understand that "filing or maintaining false public records" and "injuring public records" are crimes under La. R.S. 14:132-133. Please be sure to answer and produce discovery with that in mind.

28.    Defendants failed to respond to Plaintiff about the April 9, 2024 public records requests within three days of it being received by them on April 11, 2024.

29.    From a discovery point of view, Defendants' answers were originally due May 9, 2024.

30.    Defendants did not provide any answers to discovery until July 29, 2024. Further, Defendants' July 29, 2024 answers were essentially a refusal to answer:

   a. For 13 of 34 document requests, "Defendants **are not producing** any documents" and *did not produce even one-single document* with their response.
   b. For all 7 interrogatories, "Defendants **are not answering** this interrogatory."
   c. For 84 of 84 admission requests, "Defendants can **neither admit nor deny** the request for admission".

31.    As a result, Plaintiff filed a motion to compel, which was heard on August 30, 2024. Subsequently, the Parish Court ordered Defendants to "produce all Cusachs-related documents".

32.    Consequently, on October 25, 2024, Defendants produced what was essentially a document dump of over 10,000 pages, with nothing categorized or organized and document production STILL exceedingly deficient. As a result, on October 29, 2025, Plaintiff filed an affidavit with the Parish Court and served it upon Defendants at approximately 5:03 p.m., Eastern Time. The affidavit stated:

After 60+ days' delay, the defendants finally responded to discovery on October 25, 2024 with a 10,000-page document dump, with more than half of that being duplicated records they knew I already scanned on October 27 and 30, 2023, as a part of my initial public records inspection. I previously expressed to the defendants' counsel that I did not want him to send me the records I already scanned. The defendants' document dump seems to have also included well over 1,000 pages of records related to artifacts that are not even part of the Cusachs Collection. The only new records related to the Collection that the defendants essentially provided me on October 25th were condition reports, master files, and ORM insurance claim documentation. …

Defendants' discovery response is still *massively and almost-wholly deficient*, even after the Court ordered the defendants to produce "produce all Cusachs-related documents" …

As I emailed the defendants' counsel yesterday (October 28, 2024):

Your client's production did not address **RFP 1-5** <u>at</u> <u>all</u>. Not one single document was produced that related to those requests, even though your original July 29, 2024 response indicated that you would be producing the records for them. **RFP 6** is still deficient, as I have not received organizational charts for the Office of Lieutenant Governor or the Department of Culture Recreation and Tourism. Further, your clients' production also did not provide one document <u>at</u> <u>all</u> that addressed **RFP 7 and 11-31**. (I'm open to letting 32-33, for now, and 34 is moot.) Shockingly, that's **28 RFPs out of the original 33 RFPs** (not counting 34, which was moot) that are still not addressed <u>at</u> <u>all</u>. Sigh. …

The defendants *<u>categorically</u>* have communications, such as emails, and other written records that fall within the scope of RFP 1, 2, and 5. Even though their July 29, 2024 written response indicates that they "will produce those documents" and the Court ordered them to do so within 60 days, they have utterly failed to do so. *<u>Not</u> <u>one</u>* record was produced.

33.  At 9:14 p.m., Eastern Time, approximately four hours after Plaintiff filed his affidavit, Defendants contacted Plaintiff and produced over 3,600 emails they had been concealing and withholding. Nonetheless, even with over 13,000 pages of documents produced in October 2024, Defendants' document production and other discovery responses were STILL exceedingly deficient.

34.  Due to a continuing lack of progress with discovery, on September 23, 2024, Plaintiff filed a SECOND motion to compel, which was heard on November 22, 2025. As a result, the Parish Court ordered Defendants to amend their discovery responses and produce a range of previously withheld documents, along with a privilege log for "all documents withheld".

**PLAINTIFF'S NOVEMBER 11, 2024 PUBLIC RECORDS REQUEST**

35.   On November 11, 2024, at approximately 1:31 p.m., Eastern Time, Plaintiff emailed the State by emailing Defendants (i.e., the co-conspirators—*hereinafter all together, generally, as "Defendants" for simplicity*) a .pdf document (hereafter the "November 11, 2024 .pdf document").

36.   The title on page 1 of the November 11, 2024 .pdf document included the capitalized words "PUBLIC RECRODS REQUESTS".

37.   The words in paragraph 25 of the "Instructions and Definitions" section of the November 11, 2024 .pdf document stated *in bold*, "**This discovery is a form of public request to YOU. La. R.S. 44:1** *et seq.* **Respond accordingly.**"

38.   Defendants failed to respond to Plaintiff about the November 11, 2024 .pdf document within three days of it being emailed to them.

39.   While, on December 18, 2024, Defendants finally emailed Plaintiff in relation to the November 11, 2024 .pdf document, Defendants did not provide any sort of public-records-availability determination, estimate of time until production, or certification, much less even acknowledge that Plaintiff made a public records request to them.

40.   To this day, Defendants have *STILL NOT* produced the public records requested on November 11, 2024 or provided Plaintiff with any sort of public-records-availability determination, estimate of time until production, or certification related to the November 11, 2024 .pdf document.

**PLAINTIFF'S DECEMBER 4, 2024 PUBLIC RECORDS REQUEST**

41.   On December 4, 2024, at approximately 5:56 p.m., Eastern Time, Plaintiff emailed Defendants (hereafter, the "December 4, 2024 email").

42.   The subject of the December 4, 2024 email was "Public Records Request".

43.   The December 4, 2024 email expressly stated, "I would like to examine ALL WPA-related documentation your clients have, Stuart. Please respond accordingly. Thank you."

44.    The December 4, 2024 email attached a 27-page .pdf document with the State's November 27, 1935; May 23, 1936; December 7, 1936; June 7, 1937; October 28, 1940; and December 7, 1940 Board of Curators meeting minutes and June 13, 1941 letter that all mention and/or describe Work Progress Administration ("WPA") projects being conducted for Defendants.

45.    Defendants failed to respond to Plaintiff about the December 4, 2024 email within three days of it being sent to them, much less even acknowledge that Plaintiff made a public records examination/inspection request to them.

46.    To this day, Defendants have *STILL NOT* produced the public records requested on December 4, 2024 for examination or provided Plaintiff with any public-records-availability determination, estimate of time until exam, or certification related to the December 4, 2024 email.

### PLAINTIFF'S DECEMBER 12, 2024 PUBLIC RECORDS REQUEST

47.    On December 12, 2024, at approximately 11:56 a.m., Eastern Time, Plaintiff emailed Defendants a .pdf document (hereafter the "December 12, 2024 .pdf document").

48.    The title on page 1 of the December 12, 2024 .pdf document included the capitalized words "PUBLIC RECORDS REQUESTS".

49.    The words in what was, effectively, the first paragraph on page 1 of the December 12, 2024 .pdf document stated: "Please see Plaintiff's 'November 2024 Discovery/Public Records Requests' for 'Instructions and Definitions'." The words in paragraph 25 of the "Instructions and Definitions" of the November 11, 2024 .pdf document stated *in bold*, "**This discovery is a form of public request to YOU. La. R.S. 44:1** *et seq.* **Respond accordingly.**"

50.    Defendants failed to respond to Plaintiff about the December 12, 2024 .pdf document within three days of it being emailed to them.

51.    While, on January 15, 2025, Defendants finally emailed Plaintiff in relation to the December 12, 2024 .pdf document, Defendants did not provide any sort of public-records-

availability determination, estimate of time until production, or certification, much less even acknowledge that Plaintiff made a public records request to them.

52.  To this day, Defendants have *STILL NOT* produced the public records requested on December 12, 2024 or provided Plaintiff with any sort of public-records-availability determination, estimate of time until production, or certification related to the December 12, 2024 .pdf document.

**PLAINTIFF'S DECEMBER 16, 2024 PUBLIC RECORDS REQUEST**

53.  On December 16, 2024, at approximately 11:01 a.m., Eastern Time, Plaintiff emailed Defendants a .pdf document (hereafter the "December 16, 2024 .pdf document").

54.  The title on page 1 of the December 16, 2024 .pdf document included the capitalized words "PUBLIC RECORDS REQUESTS".

55.  The words in what was, effectively, the first paragraph on page 1 of the December 16, 2024 .pdf document stated: "Please see Plaintiff's 'November 2024 Discovery/Public Records Requests' for 'Instructions and Definitions'." The words in paragraph 25 of the "Instructions and Definitions" of the November 11, 2024 .pdf document stated *in bold*, **This discovery is a form of public request to YOU. La. R.S. 44:1** *et seq.* **Respond accordingly.**"

56.  Defendants failed to respond to Plaintiff about the December 16, 2024 .pdf document within three days of it being emailed to them.

57.  While, on January 15, 2025, Defendants finally emailed Plaintiff in relation to the December 16, 2024 .pdf document, Defendants did not provide any sort of public-records-availability determination, estimate of time until production, or certification, much less even acknowledge that Plaintiff made a public records request to them.

58.  To this day, Defendants have *STILL NOT* produced the public records requested on December 16, 2024 or provided Plaintiff with any sort of public-records-availability determination, estimate of time until production, or certification related to the December 16, 2024 .pdf document.

**PLAINTIFF'S DECEMBER 19, 2024 PUBLIC RECORDS REQUEST**

59.    On December 19, 2024, at approximately 5:37 p.m., Eastern Time, Plaintiff emailed Defendants a .pdf document (hereafter the "December 19, 2024 .pdf document").

60.    The title on page 1 of the December 19, 2024 .pdf document included the capitalized words "PUBLIC RECORDS REQUESTS".

61.    The words in what was, effectively, the first paragraph on page 1 of the December 19, 2024 .pdf document stated: "Please see Plaintiff's 'November 2024 Discovery/Public Records Requests' for 'Instructions and Definitions'." The words in paragraph 25 of the "Instructions and Definitions" of the November 11, 2024 .pdf document stated *in bold*, "**This discovery is a form of public request to YOU. La. R.S. 44:1 *et seq.* Respond accordingly.**"

62.    Defendants failed to respond to Plaintiff about the December 19, 2024 .pdf document within three days of it being emailed to them.

63.    While, on January 15, 2025, Defendants finally emailed Plaintiff in relation to the December 19, 2024 .pdf document, Defendants did not provide any sort of public-records-availability determination, estimate of time until production, or certification, much less even acknowledge that Plaintiff made a public records request to them.

64.    To this day, Defendants have *STILL NOT* produced the public records requested on December 19, 2024 or provided Plaintiff with any sort of public-records-availability determination, estimate of time until production, or certification related to the December 19, 2024 .pdf document.

65.    Defendants did not file a motion for expedited hearing about (a) the November 11, 2023 .pdf document, (b) the December 4, 2024 email, (c) the December 12, 2024 .pdf document, (d) the December 16, 2024 .pdf document, or (e) the December 19, 2024 .pdf document.

66.    Through his pleadings in *Cusachs v. State* prior to emailing Defendants (a) the November 11, 2023 .pdf document, (b) the December 4, 2024 email, (c) the December 12, 2024 .pdf document,

(d) the December 16, 2024 .pdf document, and (e) the December 19, 2024 .pdf document, Plaintiff provided Defendants all relevant statute and jurisprudence related to Public Records Law and how to lawfully respond to public records requests.

67.    Defendants did legal research about and responded to Plaintiff's Violation of Public Records Law claims in *Cusachs v. State* and understood Public Records Law.

68.    On January 10, 2025, the Parish Court in *Cusachs v. State* signed a judgment in Plaintiff's favor and against the State for Violation of Public Records Law and found it failed to properly respond to the four original sets of public records requests made November 9, 2023, January 2, 2024, January 21, 2024, and February 20, 2024 by Plaintiff.

69.    The Parish Court's January 10, 2025 Public Records Law judgment ordered that Defendants "shall" provide the public records Plaintiff requested. Yet, Defendants failed to provide Plaintiff with *all* the public records he requested and also failed to explain the absence of public records. Therefore, Defendants continue to violate Louisiana's Public Records Law.

70.    Defendants' ongoing lack of lawful response to Plaintiff's public records requests and discovery led to Plaintiff filing a THIRD motion to compel on February 17, 2025. In that motion—filed almost a full year ago, now—Plaintiff very clearly detailed numerous public record types that Defendants have blatantly omitted from their production and refused to produce.

    a. Plaintiff sued the entire State over the fraud/crime that has occurred. Yet, Defendants have not provided all "Cusachs related" emails from the email servers of the DCRT or even one single email off email servers of other Louisiana subdivisions/agencies such as the Office of Lieutenant Governor or the Department of Justice (which have people within them who are co-conspirators to the issues raised herein).

    b. While attorney David Dalia was specifically hired/contracted to oversee the handling of the Collection return to Plaintiff, Defendants have not produced a copy of his contract, the 2014 report he wrote related to the Collection return, or what is likely to be hundreds of emails between himself and State representatives about the Collection.

    c. Defendants have refused to deliver what Plaintiff is informed and believes is literally thousands of images of Collection artifacts.

    d. Defendants have failed to and refused to produce all the documents related to the State Museum accreditation process with the American Alliance of Museums—which puts

forth standards and protocols for museum management, including issues like the handling and return of loaned artifacts, such as the Collection.

e.  Defendants have also failed and refused to produce their "Annual/Biennial Reports of the Board of Curators" and "Board Meeting Minutes of the Board of Directors of the Louisiana State Museum" for the period of 1940 to present.

f.  Among numerous other categories of records, Defendants have also refused to produce settlement agreements Defendants convinced other lenders to sign (like the one the State attempted to force Plaintiff to sign).

## DEFENDANTS ARE DOING EVERYTHING THEY CAN TO RIG PUBLIC RECORDS LAW

71.   Nineteen days after Plaintiff filed his *Cusachs v. State* lawsuit, seeking judgements against the State's representatives, *individually*, because their reckless and fraudulent behavior made them individually responsible for damages, the State introduced ("read by title") 2024 House Bill 768 to amend and reenact Public Records Law, so that State representatives could no longer be held *personally* liable for penalties (such as damages, fines, attorney fees, and other costs of litigation) when they violated Public Records Law. Roughly two months (72 days) later, the Governor read the bill, understood its purpose, and signed the bill to be law. See 2024 La HB 768/Act 493.

72.   It is very rare that the State can legislate a bill and have it signed into law by the governor in roughly two months. After Plaintiff sued the State, in *Cusachs v. State*, it contacted co-conspirators in the Legislature and made some sort of request or suggestion that RS 44:35(E) should be amended and reenacted to remove any personal liability for penalties under Public Records Law.

73.   In *Cusachs v. State*, on November 26, 2024, the Court, granted, in part, Defendants' Motion for Protective Order and signed a judgment/order that Plaintiff was "prohibited from directly contacting" State representatives and, therefore, "shall make his future public records requests" through the State's counsel, the true Defendants here, including attorney Stuart Kottle.

74.   Plaintiff sent (a) the November 11, 2023 .pdf document, (b) the December 4, 2024 email, (c) the December 12, 2024 .pdf document, (d) the December 16, 2024 .pdf document, and (e) the December 19, 2024 .pdf document to the State through attorney Stuart Kottle, as ordered.

**DEFENDANTS CONSPIRE TO CONCEAL PUBLIC RECORDS THAT PROVE THE STATE'S RECKLESS MANAGEMENT, FELONY FRAUD AND THEFT OF PROPERTY**

75.    During the 1930s-1940s (after the 1929 death of Gaspar Cusachs), the State applied for and was provided U.S. Government grants (free money) for the Louisiana State Museum Project (a.k.a. the "WPA Project") and subprojects, such as the ***Cabildo Record Preservation Project***, completed by the Works Progress Administration ("WPA"). Those projects included *inventories* *and* *imaging* to record detailed information about the historical artifacts they possessed, at that time.

76.    The State now claims none of the WPA-related records exist (and ironically allege neither the "Cabildo Record Preservation Project" records nor the logbooks voted by the Board to be made a part of the Defendants' permanent record were preserved). The State refused to provide information about how and when the records became nonexistent. The State destroyed and/or withheld public records to conceal their reckless management, including the theft and sale of historical artifacts, such as those in Plaintiff's Collection. Defendants conspired with and assisted the State to do so.

77.    In 1952, accusations of significant improprieties in the State Museum's operations led to a state audit, a criminal investigation and indictment of the State Museum director, and a finding that not only was the State Museum's very first accession ledger "missing"[21] (stolen) but many priceless, irreplaceable artifacts were also missing, including an 1803 proclamation issued by Pierre-Clément de Laussat, the French colonial prefect of the time of the Louisiana Purchase. (The first accession ledger listed the first years of Collection artifact loans, including three different 1803 proclamations issued by Pierre-Clément de Laussat that have not been returned to Plaintiff.)

78.    In 1952, The Times Picayune reported the following:[22]

a.    "Auditor Checks State Museum", an August 11, 1952 article in *The Times Picayune* (p 8) reported, "Ben B. Mathews, executive director of the Louisiana State Museum, said Saturday the state auditor's office is making an inventory of all museum possessions

---

[21] Why would an accession ledger be "missing" (i.e., stolen and never recovered), unless someone was looking to cover up the theft of artifacts?

[22] All *The Times Picayune* articles referenced are "ancient documents". La CE Art 803(16).

and finances. … The inventory of museum possessions, Mathews said, is necessary because there are no records of such possessions. Their lack, he explained, makes it very difficult to locate any particular object."

b. "Museum Pieces on Private Loan", an August 27, 1952 article in *The Times Picayune* (pp 1, 3) reported, "Priceless publicly owned documents and valuable paintings and museum pieces are on loan by the Louisiana state museum to private individuals. … Included are many pieces borrowed in 1950 by former Gov. Richard W. Leche, who has them on exhibit in his home near Bayou Lacombe, St. Tammany parish. Others have been in the governor's mansion in Baton Rouge since they were loaned on Oct. 12, 1918 'at request of Mrs. (Earl K.) Long.' And the system of keeping the records on many more loaned articles has been described as 'very loose.'"

c. "Double Dip Laid to Museum Pair", an August 29, 1952 article in *The Times Picayune* (pp 1, 2) reported that the State's senior museum leadership (Sidney "Pay Me" Revere[23] and James J.A. "Pay Me Too" Fortier) were double-dipping by paying themselves twice for the same job, plus using the museum's petty cash as a personal piggy bank. "District Attorney Severn T. Darden announced that he, too, was interested in the recent management of the Cabildo, from which many priceless historic treasures have been reported missing. … followed right behind an announcement Wednesday by criminal district court Judge William J. O'Hara, who will be in charge of the grand jury that … would be asked to probe museum affairs of recent years. … [Ben] Mathews said … for years the museum has been lending documents, paintings, and other objects to individuals and organizations without insurance coverage [and little to no loan documentation, and] *one of the accession books kept in [a safe] was [now] missing* … the missing book could lead to a clue as to the whereabout of a proclamation issued by the French colonial prefect at the time of the Louisiana purchase in 1803 … He had stated Wednesday that there were many [odd] changes and erasures noted in the record books.

d. "DA Office Begins Check on Cabildo", a September 4, 1952 article in *The Times Picayune* (p 42) reported, "The museum probe stems from disclosures that hundreds of museum pieces, of inestimable value, are missing, many of them out on loan. … [DA] Haggerty said he learned from Matthews that the last physical inventory of the museum was made in 1934 by the Works Progress Administration (WPA). He said he advised Mathews to begin an inventory 'as soon as possible' to determine what was 'on loan' and what was missing.' Many items were on loan to ex-Gov. Richard Leche, who displayed them at his Bayou Lacombe home … There had been disclosures by the newspapers of indicated irregularities in handling museum funds, such as using museum checking for personal purchases."

e. "Mathews Urges Museum Cleanup", a September 12, 1952 article in *The Times Picayune* (p 23) reported, "The grand jury is conducting an investigation of the

---

[23] Through nepotism, Sidney Paul Revere was appointed museum director by his two brothers-in-law, "Uncle Earl" and "The Kingfish" (Gov. Earl Long and ex-Gov., US Senator Huey Long).

museum. It was started after Mathews and aids found numerous erasures in records and learned that many objects and valuable papers are missing from the institution. ... Mathews said that there are '**thousands upon thousands of valuable papers missing from our museum**. Where they have gone I don't know, but I think the grand jury intends to find out.'"

f.  "Kolb Criticizes Past Records of Louisiana State Museum", a November 14, 1952 article in *The Times Picayune* (p 1) reported, "State auditor Allison Kolb criticized records of the Louisiana State Museum in New Orleans and questioned 'the propriety of many recorded transactions. … The records have been maintained in an inefficient manner and the supporting documents were irregular and vague in many cases. As a result, we were unable to satisfy ourselves as to the completeness and accuracy of the records and as to the propriety of many recorded transactions.'"

79.  After well over literally hundreds of thousands of dollars in grants from the U.S. Government in the 1930s-1940s (which equates to many millions of dollars today) and a supply of hundreds of people to help, by 1955 and as a result of reckless management, the State Museum operations were in complete disorganization and disrepair. The State's public records include the July 1855 report of Mrs. Margaret Bush, from the Chicago Art Institute, who was hired as a consultant by the State Museum to help improve museum operations. Her report states:

First may I say that I have never encountered sue filth and disrepair anywhere. Dirt is not a synonym for the historic. The past complete disregard for preservation of your collection is evident on every hand. Cracked ceilings, crumbling walls, damp floors with standing water in patios have apparently gone unnoticed for many years. The dirt allowed to accumulate and moisture (lack of dehumidifying and air conditioning) are fast destroying many valuable and irreplaceable objects in your important collections.

In checking objects, I find one-third to one-half without any marking whatsoever. For these cases it has been necessary to set up a numbering system. Many articles are mismarked, the number on the article does not agree with the record made. In countless cases of a large gift or loan, hundreds of items carry one number. The entry for those in the Accession Book is often so vague that it has been necessary to check page after page of these entries, often being unable to find any descriptive entry whatsoever. Also I have found objects bearing two numbers, both of which are wrong. Many entries are in the books for which we have found no objects.

There are often entries in the books showing that articles have been returned to lenders. We have found many of these articles still in the museum without any record as to when they came back, whether they came back as loans or gifts or whether or not they actually left the premises after the notation "Returned" was made.

80.  The Times Picayune reporting in the decades *after* 1952 evidence that the numerous problems with the State Museum management and operations simply continued unabated:

a.  "State Museum Seeks Curator", a December 11, 1964 article in *The Times Picayune* (sec 1, p 19) reported, "The Louisiana State Museum, which has been without a curator since the late 1950's, was negotiating Thursday to hire Clay Watson, Jazz Museum director, as curator. [A decade without a museum curator?]

b.  "Director Controversy Focus", an October 8, 1972 article in *The Times Picayune* (sec 1, pp 1, 2) reported, "The Louisiana State Museum has become an extension of its director, Mrs. Peggy Richards, a former resident of California and realtor at the time of her appointment by the governor in 1964. … prior to her appointment, as museum director, she had operated a real estate agency in the city and had no experience in the museum field. … An examination of her eight-year stewardship of the Louisiana State Museum reveals a deep mistrust between herself and museum staff and the 11-member museum board, members of which have accused her of mismanaging the museum.

c.  "Nice Place to Visit--Would You Wanna Work There?", an October 12, 1972 article in *The Times Picayune* (sec 1, pp 28, 29) reported, "Employees of the Louisiana State Museum say that leadership is so lacking at top management levels that employee morale cannot be classified as 'high' or 'low' because 'there just isn't any employee morale.'"

d.  "Cataloguing of Artifacts Could Take 250 Years", an October 16, 1972 article in *The Times Picayune* (sec 1, p 3) reported, "Curatorial staff members at the Louisiana State Museum estimate that at the present rate **it will take 250 years to catalogue the more than *five million artifacts and documents*** in the museum's collection. Most of the uncatalogued items are in storage and away from public view. As a result, it is nearly impossible for museum officials to know exactly what possessions the museum had or how to properly keep track of known possessions. Mrs. Peggy Richards [museum director and former real estate agent with no curatorial or other museum experience] has been curator. A statistical report compiled by the museum's curatorial department earlier this year … shows that there are only two persons working in the museum's recorder's office and cataloguing the museum collection. (One of them resigned Friday.) … In fact, they're so far behind, they are now working on the accessions for 1967." An image shows and text described museum artifacts "strewn about three floors of the building, uncovered and in some cases rotting."

e.  "Friends Plan Museum Probe", an October 18, 1972 article in *The Times Picayune* (sec 1, p 14) reported, "The Friends of the Cabildo Monday night

expressed their displeasure with certain aspects of the Louisiana State Museum [and] said that a majority of the 11 members on the present board had been negligent in their duties.

f.  "History-rich maps rescued from auction", a November 4, 1982 article in *The Times Picayune/The States Item* (sec 1, p 13) reported, "A collection of missing 200-year old maps telling the story of Louisiana's Spanish land grants has been saved from the auction block and should be returned to New Orleans within the month, the director of the Louisiana State Museum said Wednesday. The more than 1,000 maps and accompanying descriptive documents, which mysteriously vanished years ago, were scheduled to be auctioned in New York.

g.  "New Director to try to dust cobwebs from state museum", an April 7, 1986 article in *The Times Picayune/The States Item* (p A-13, 14) reported, new director George R. Adams said, "There has never been a thorough, modern, computerized inventory of our collection, which includes about ***3 million items*** … [and] I didn't realize the seriousness of the state's fiscal problems."

h.  "Cuts threaten museum, director tells La. board", a February 2, 1989 article in *The Times Picayune* (p A-16,) reported, "Director James F. Sefcik said budget cuts threatened by Gov. Roemer could mean 'the effective destruction of the Louisiana State Museum system … This museum is incredibly underfunded and understaffed.'"

i.  "Museum ponders its mysteries", an August 4, 1990 article in *The Times Picayune* (p B-1, 3) reported, "The 1988 fire that devastated the Cabildo and the recent discovery that 60 rare John James Audubon bird prints had been stolen from the Presbytere also pointed up another problem: The museum has no complete inventory of its vast collections, thought to contain as many as ***2 million items***. After the Cabildo fire, the museum staff spent more than a year trying to identify which artifacts, especially furniture, had been damaged or destroyed, how much they were worth and even who owned many of them. In some cases, records were so sketchy that officials simply had to guess what had been burned. When the disappearance of the Audubon prints was discovered June 25, officials were hampered in discovering what other artworks were missing by the lack of unified, comprehensive catalog of the museum's holdings. The main reason for the disorganization, museum Director James F. Sefcik said Friday, are the museum's checkered history and its inadequate budget. From its founding in the 20th century to the 1970s, the museum, short on money and often caught up in politics, had few professionally trained employees. Even its directors often lacked museum experience and training."

j.  "Audubon prints returned", an August 28, 1990 article in *The Times Picayune* (p B-4) reported, "Two-thirds of the 60 John James Audubon 'Birds of America' prints stolen from the Louisiana State Museum last fall are back at the Museum. Museum officials Monday opened a package of 40 prints from a

Chicago dealer who bought them from Michael R. Moskaluk, the former museum volunteer charged with stealing the Audubon prints and more than 40 other artworks from the museum … Museum officials are still uncertain how *Moskaluk allegedly managed to steal the large 'elephant folio' prints, which are about 3 feet by 3½ feet*."

81.    On March 20, 1990, James F. Sefcik, the State Museum director, at that time, sent a memorandum to John N. Kennedy, special counsel for the Office of the Governor:

> The fire at the Cabildo has magnified huge problems in collections management in New Orleans with antiquated record keeping, materials on loan to the Museum literally for decades, inadequate insurance records, standard storage conditions, and many other problems due to the lack of qualified collections management personnel, computer equipment, or collections curators specializing in decorative arts, science and technology, political history and other subject areas that comprise the Louisiana State Museum collection of approximately ***3,000,000 artifacts***. These collections deteriorate daily due to the lack of attention.

82.    As written above, *The Times Picayune* quoted museum director Peggy Richards stating the museum had *FIVE MILLION* artifacts (10/16/72) and director George Adams stating *THREE MILLION* artifacts (04/07/86), which was echoed in Jim Sefcik's letter to the Governor's Office (03/20/90). Yet, page 26 of Defendants' DCRT "Sunset Report 2024" states their museum operations now only has "*approximately HALF-MILLION* artifacts". The enormous change from five million artifacts in 1972 to half million in 2024 tends to evidence that the State either recklessly had stolen, destroyed, or sold millions of artifacts in their care.

83.    In the 35 years since Mr. Sefcik's 1990 letter, the State has done little to change and better manage the artifacts in their care. In 2023, the Louisiana Legislative Auditor ("LLA") issued a negative performance report for Defendants' museum operations and found:

   a.    OSM has not had a permanent museum director since May 2016, which resulted in a pattern of inconsistent leadership. According to multiple stakeholders, the museum director's position has little autonomy and is political in nature due, in

part, to the governance structure [i.e., political interference]."[24 and 25]

b. OSM does not have a comprehensive strategic plan or detailed budget for the museum system or its exhibits.

c. Reduced staffing levels over several years has led to low employee morale and may affect museum operations. For example, full time staff decreased 41.7%, from 108 employees in fiscal years 2009 to 63 in fiscal years 2022.[26]

84. As a result of a negative performance audit by the LLA, ex-museum director Susan Maclay,

wrote back to the LLA and openly admitted:

> For several years the OSM has operated with a lack of sufficient funding and staffing. Additionally, while funding and staffing levels have diminished, responsibility for additional properties has increased. Less resources with added responsibilities have resulted in many issues outlined in the audit report. … Currently, due to low staffing numbers, staff members are performing multiple job functions to keep the museum operating.

85. Evidence of the State's ongoing dysfunction continues to pile up, even recently:

a. "Low morale, fast staff turnover: why the credibility of Louisiana's ten state museums is at risk", a September 30, 2025 article on www.theartnewspaper.com reported. "The credibility of ten cultural institutions under the auspices of the Louisiana State Museum (LSM) system is on the line. … A decision regarding LSM's [American Alliance of Museums] accreditation will be made sometime next year. … LSM's failures have largely been blamed on insufficient funding in the wake of state budget cuts. The museum system has also had inconsistent leadership in recent years, with directors and interim directors turning over a total of 11 times between 2004 and 2023, often following conflict with the lieutenant governor."

b. "How did Louisiana lose an ancient, 20-foot board of cypress wood? 'It's a piece of history'", a September 12, 2025 article on *www.nola.com* reported, "An

---

[24] The LLA's report quoted a staff survey: "[The Museum Director turnover/vacancies] is probably the greatest challenge that the museum has faced since 2008, when the constant turnover of directors and interim/acting directors began. Priorities shift constantly, and it is not possible for a constantly changing leadership to advocate effectively for the museum."

[25] The LLA's report stated: "According to the study, the current governance structure creates political interference and tension, makes fundraising a challenge, and could risk OSM losing accreditation. In addition, according to multiple stakeholders, there is long-standing tension between the LSM Board and OSM, as well as internal tension within the LSM Board."

[26] The LLA's report stated: "The Lord governance study also found that OSM is '**woefully underfunded and understaffed**.' The report recommended increasing staffing to 208 full-time employees, which is an increase of nearly 145 full-time employees from current staffing levels."

ancient, 20-foot cypress wood board that held a prominent place at the State Capitol for decades has gone missing, and no one seems to know where it is. Or at least no one is admitting it. … "It was a museum piece on display for the people of Louisiana."

c. "Liz Murrill calls on former House Speaker to return historic artifact that's missing", a September 17, 2025 article on *www.theadvocate.com* reported, "Find it and give it back. That was Attorney General Liz Murrill's message Tuesday for former House Speaker Clay Schexnayder regarding an ancient cypress board that was displayed at the State Capitol for decades but disappeared last year after being in Schexnayder's district legislative office in Gonzales. "I will confer with the Lieutenant Governor's Office and will take any action that may be appropriate under the circumstances," Murrill said … .[27]

d. "Former Louisiana House speaker enters plea in rare state artifact theft case", a January 8, 2026 article on *www.msn.com* reported, "Former Louisiana House Speaker Clay Schexnayder pleaded not guilty Thursday to charges of felony theft over $25,000 and malfeasance in office, stemming from the disappearance of a rare Louisiana state artifact [the missing 20-foot cypress wood board]. … Attorney General Liz Murrill issued a blunt response to the indictment. "You don't get to keep State property, it doesn't belong to you," Murrill said.

86.   The bottom line is that the State has known about its mismanagement, operational disfunction, and even theft problems for many decades (mostly stemming from a lack of proper budget and manpower because of the State's willful refusal to properly fund State Museum operations). Yet, the State continues to plainly ignore matters. It is continuous, self-inflicted damage the State has done and, as a residual, done to the Collection and, therefore, to Plaintiff.

87.   Numerous 2016-2023 emails produced by Defendants in October 2024 prove when, in 2023, the State's representatives informed Plaintiff "all matters involving the Cusachs collection were resolved in 2016" … "We do view this matter as closed", they had regularly discussed finding and cataloguing Collection artifacts, knew they had unreturned ones in their possession, and had even unlawfully altered TMS, their collection management software records (digital public

---

[27] Why hasn't the Attorney General said the same things about the return of the Collection? Respectfully, Attorney General Murrill, Plaintiff would like to ask you to also use your power to *publicly demand* that all the artifacts of the Collection be found and given back to him too.

records), to conceal possession of Collection artifacts because they knew they shouldn't have them.

88.    In fact, the October-2024-produced emails show, in the months right before the State's representatives informed Plaintiff, in April 2023, they did not possess more Collection artifacts, they *openly discussed and even **openly joked about** the fact that they still had Collection artifacts*.

a.    In an August 29, 2016 email, Registrar Elizabeth Sherwood informed DCRT Deputy Secretary Rennie Buras and five staff about seven more Collection artifacts found, which DCRT Deputy Secretary Buras forwarded to defendant-attorney David Dalia as a "report from the registrar regarding the search".

b.    In a June 9, 2022 email, Sarah-Elizabeth Gundlach sent her husband, defendant-Director Greg Lambousy, a copy of a spreadsheet named "**Keep_Cusachs.xls**," which included a list of 55 historical books from the Collection.

c.    In a July 14, 2022 email thread, Claudia Kheel emailed defendant-Director Patrick Burns "There are about 500 boxes of books … What I would like to do is have them sold through book dealers … From what I saw they were Cusachs".

d.    In a July 14, 2022 email, defendant-Director Patrick Burns discussed with Claudia Kheel his plan to speak with defendant-OSM Deputy Assistant Secretary Micheal McKnight about selling boxes of books that included Cusachs books.

e.    In a July 26, 2022 email from Claudia Kheel to Patrick Burns about hiding Cusachs artifacts, she wrote, "Sarah Elizabeth will have a fit about the Cusachs, so I plan on putting the Cusachs books on the highest shelf in Visual Arts storage at the Mint".

f.    In a September 9-12, 2022 email thread involving eight museum curators, including the defendant-Director Patrick Burns, Claudia Kheel stated "I run across Cusachs materials frequently that are still at the museum". Kika Kikla added, "All the Cusach[s] objects (aside from what we bought back at auction) should have the 'closed loan' status *since we're not supposed to have them*." Karen Leathem added "We will be *haunted* by Cusachs forever." Sarah-Elizabeth Gundlach also added "And you're right, we will be finding Cusachs stuff forever."

g.    In an October 4, 2022 email, Karen Leathem asked "Is the powder horn a Cusachs item, by any chance?" Ann Mahoney replied "Yes, the horn is a Cusachs loan".

h.    In a February 10, 2023 email, Claudia Kheel emailed New Orleans book dealer Crescent City Book and Joe Phillips, "Mr. Phillips I have had the 50 of the book inventories converted from Excell to PDF." Ms. Kheel attached a copy of "LSM

Book Inventory Box 1-50 (003).pdf", which had Cusachs books listed in it.

89.    While, on April 5, 2023, the State informed Plaintiff that "all matters involving the Cusachs collection were resolved in 2016 … All Cusachs objects which could be located were returned … *None were retained*", in February 2024, the State admitted it had 29 Collection artifacts. In August 2024, the State admitted it had 46 artifacts. By March 2025, the State admitted that it had located well over 100 artifacts. (See LSM 020262-020274.)

90.    All of the above-identified found artifacts are evidenced to be loaned Collection artifacts by numerous inventories previously made by the State. Yet, Defendants have *STILL* refused to return those artifacts to Plaintiff and have embarked on a course of action that is clear conversion and effectively a conspiracy to commit felony theft of that property and/or its dollar value.

91.    Defendants have STILL not produced to Plaintiff or allowed him to examine all the public records he requested. Defendants have also refused to explain the absence of and/or why public records evidenced to previously exist (by other public records; e.g., Defendants' Museum Board of Curators Meeting Minutes and accession ledgers) somehow do not exist anymore.

92.    Defendants have been actively conspiring to conceal and withhold public records in an attempt to (a) permanently convert and commit theft of Plaintiff's Collection artifacts and/or the dollar value of that property, (b) conceal that the State has had stolen, destroyed/damaged, and/or somehow otherwise permanently lost millions of historical artifacts in their care and have also been methodically selling artifacts, (c) conceal the fact that Plaintiff and his family are not the only museum lenders who were mistreated and defrauded by the State.[28]

---

[28] There are likely dozens, if not hundreds, of defrauded families. For example, see "A Black Art Dealer Lent Paintings to a Museum. His Heirs Want Them Back", a December 12, 2024 article on www.newyorktimes.com, where State representatives "agree to assume" the way the museum obtained paintings in the early 1900s from the lender and his family "was a historical injustice" and, even though, the roughly 60 paintings have not been displayed or used by the museum for many decades, the State has refused to give them back. [It's just greed keeping the paintings.]

### DEFENDANTS CONSPIRE TO DEFRAUD AND OBSTRUCT JUSTICE
### BY DEFAMING PLAINTIFF

93.    Defendants purposely denigrated and defamed Plaintiff by repeatedly accusing him of criminal behavior to negatively impact the Parish Court's (and the public's) opinion of him.

94.    Defendants claimed Plaintiff transferred ownership of the Collection to himself "solely" to avoid having to pay an attorney in *Cusachs v. State*, which resulted in him litigating *Cusachs v. State* in a pro se capacity and allegedly being engaged in the unlawful practice of law.

95.    In their February 21, 2025 exception of no right of action, Defendants published alleged statements of fact about Plaintiff, including his alleged premeditation of a criminal act:

> By filing this lawsuit under the caption "Cusachs" and signing the pleadings in his own name (*in propria persona*), Mr. Lingle conceals his true act—engaging in the unauthorized practice of law by representing the rights, if any, of Elysian, Inc. or Elysian Fields Trust. [¶ 1] … On March 6, 2024, Plaintiff, David Lingle, on behalf of "Cusachs," a fictitiously named plaintiff, filed this suit against Defendants [¶ 2] … On March 3, 2024—three days before the filing of the Original Petition—Elysian, Inc.'s board of directors supposedly convened to authorize Mr. Lingle to file this lawsuit in his individual capacity. [¶ 12] Mr. Lingle filed this suit individually to circumvent Louisiana's prohibition on the unauthorized practice of law because, as a nonlawyer, he could not represent the interests of Elysian, Inc. [¶ 15] … Elysian, Inc.'s March 3, 2024 minutes constitute a paradigmatic example of an unlawful transfer of rights, including litigious rights, done solely to allow a nonlawyer, Mr. Lingle, to sue *pro se* on behalf of a corporation. [¶ 16] … In filing this lawsuit on behalf of and by an unlawful assignment from Elysian, Inc., Mr. Lingle has engaged in the unlawful practice of law [¶ 17] … Mr. Lingle has produced documents demonstrating that he filed this lawsuit effectively on behalf of a juridical entity, Elysian, Inc., and that the corporation improperly transferred its rights to the Collection to Mr. Lingle for the sole purpose of circumventing the prohibition against corporations appearing *pro se* in litigation. *See* LA. REV. STAT. § 37:212 [p. 1] …The Court should not countenance such a premeditated violation of its rules or the law. [p . 2] … On March 6, 2024, Mr. Lingle, on behalf of "Cusachs," a fictitiously named plaintiff, filed this suit against Defendants, alleging causes of action concerning the Collection. [p. 2]. … Elysian, Inc. Purportedly Assigned the Right to File This Lawsuit to Mr. Lingle Three Days Before He Filed It. [p. 8] … The board's minutes reveal, however, Elysian, Inc. supposedly transferred whatever rights it held in the Collection to Mr. Lingle solely to avoid having to hire a lawyer to file and represent it in this lawsuit [p. 9].

96.    In their June 2, 2025 post hearing brief, Defendants re-stated alleged facts about Plaintiff,

including his premeditation of a criminal act:

> David Lingle is engaged in the unauthorized practice of law by representing the interests of a juridical entity or a trust [p. 1] … Lingle claims ownership transferred to him in two phases: first, in 2011 or 2014, via the Elysian Fields Trust and, second, in 2023, when Cusachs Family Collection, LLC conveyed its 50% interest to Elysian, Inc. [p. 2] … Lingle, on behalf of "Cusachs," *a fictitiously named plaintiff*, filed this suit on March 6, 2024 against Defendants, alleging causes of action concerning the Collection. [p. 3] … Despite this claim of ownership based on Elysian, Inc.'s 2011 Meeting Minutes, as demonstrated below, the evidence shows that the Elysian Fields Trust, Elysian, Inc., or both, hold those rights and that Lingle unlawfully attempted to usurp them for himself, <u>*at least in part*</u>, to circumvent Louisiana law prohibiting the unauthorized practice of law. [p. 9] … **David Lingle is Engaged in the Unauthorized Practice of Law.** Lingle unlawfully attempts to represent the interests of Elysian, Inc. or Elysian Fields Trust—or those entities' majority shareholder and beneficiary (Devon Lingle)—in this lawsuit. [p. 10] … LA. REV. STAT. § 37:212. Those who violate these provisions commit **a criminal act** and "shall be fined not more than one thousand dollars or imprisoned for not more than two years, or both." *Id.* § 37:213(C). [p. 10] … Other jurisdictions agree that such assignments are "*sham transactions*" designed to "circumvent the rules governing the unauthorized practice of law." [p. 12] … Numerous courts have likewise rejected "*sham transactions*" meant to evade the legal requirement to retain a lawyer. [p. 12] … Lingle changed course only "so that the expense of a lawsuit [would be] minimized, as much as possible." Exhibit 12, 2024 Meeting Minutes. [p. 14] Lingle's alleged transfers are precisely the kind of *sham transactions* courts routinely disallow. [p. 16] … Lingle admitted, under oath, that the 2011 Meeting Minutes did not effectuate any "actual transfer" of property or rights in the Collection. *See* Ex. A, Hr. Tr., p. 117:17-19 ("I wasn't actually transferring anything"). Lingle conceded this point multiple times in his testimony. *E.g.*, *id.*, p. 118:23-28 ('There's nothing specifically being . . . transferred per se. Like I said, I didn't intend to. I didn't know about the [C]ollection at this point"). [p. 19]

97. Defendants' statements about Plaintiff in the paragraphs above were false and defamatory, with some bluntly accusing Plaintiff of criminal behavior (defamatory *per se*). Defendants intentionally denigrated and defamed Plaintiff to (a) negatively sway people's opinion of him and (b) antagonize, embarrass, humiliate, and cause him severe emotional distress and mental anguish.

98. Defendants knew no transfer of ownership occurred on July 25, 2011 or March 3, 2024, as a result of Elysian Inc's board meetings on those days. In fact, there is nothing in the March 3 minutes that even insinuates, in any way, an ownership transfer occurred on that date.

99. Further, Defendants knew there is nothing in the March 3, 2024 board meeting minutes

that could even insinuate the March 3 meeting was "*convened to authorize* Mr. Lingle to file this lawsuit in his individual capacity", as Defendants' allege. There is not even any remotely-possible iteration of the word "authorize" in the March 3 meeting minutes.

100.   Moreover, Defendants had no genuine basis to claim that a transfer of ownership was "done *solely* to allow a nonlawyer, Mr. Lingle, to sue *pro se* on behalf of a corporation" or "*for the sole purpose of* circumventing the prohibition against corporations appearing *pro se* in litigation."

101.   In *Cusachs v. State*, Plaintiff testified under oath (and by sworn affidavit) that the first time he ever held any sort of belief that his side of the Cusachs family (his grandfather Barnett's blood line from Gaspar Sr.) might have had even just a partial claim to the Collection was June 2014.

102.   Prior to September 2014, Plaintiff and the State were adamantly informed by descendants of Maurice and Louis Cusachs (Barnett's brothers, whose descendants were Plaintiff's cousins, aunts, and uncles) that they were 100% owners of the Collection. It was not until September 2014 that those descendants gave up their claim and agreed Plaintiff's side of the family (his grandfather Barnett's blood line from Gaspar Sr.) owned 50 % of the Collection.

103.   Moreover, based on the unambiguous wording in the extract of trusts for Philomene Cusachs and Mary Cusachs (Plaintiff's grandmother and mother), plus Mary Cusachs' last will and testament, it is not genuinely disputed that their attempted transfer of "all" property to trust was invalid, as a donation and/or transfer of "all" one's property into trust during his/her life, with nothing left for subsistence, is legally null and void.[30]Therefore, the very earliest any transfer of the first 50% of Collection ownership from the Elysian Fields Trust to Plaintiff (individually) could have occurred would have been *after* the 2015 succession of Philomene and Mary Cusachs.

104.   Defendants knew and *did not dispute* the following:

   a.   No ownership was transferred in 2011, and Plaintiff didn't know who owned the Collection at that 2011 point in time [Def. PHB (06/02/25), p. 19; Hr. Tr., 116:28-117:24, 118:23-28 (03/31/25)].
   b.   Plaintiff did not have any basis to believe his side of the Cusachs family (his

grandfather Barnett's blood line from Gaspar Sr.) had any claim to the Collection until June 2014 [Pltf Oppo (03/22/25), p. 3; Hr. Tr., 126:5-7 (03/31/25)].

c. Plaintiff's aunts, uncles, and cousins hotly disputed that his side of the Cusachs family (his grandfather Barnett's blood line from Gaspar Sr.) held any Collection ownership rights all the way up until September 2014 [Def PHB (06/02/25), p. 6; Hr. Tr., 126:7-10, 176:17-22 (03/31/25)].[29]

d. The extract of trusts of Philomene and Mary Cusachs and the will of Mary Cusachs evidence they each attempted to transfer *all* *their* *property*, ownership, and interests to their trusts, which made the transfers null "as to the whole".[30]

## DEFENDANTS CONSPIRE TO DEFRAUD AND OBSTRUCT JUSTICE BY PLEADING FALSE (i.e., FAKE) FACTS AND LAW

105.  In *Cusachs v. State*, the petition and first amended petition included a clear statement about who the plaintiff is in relation to the claims made: "Plaintiff David Lingle (a.k.a. David Cusachs, hereinafter "Cusachs") is a natural person of age and majority[. He is] the great grandson of Gaspar Cusachs and currently the sole legal owner of the Gaspar Cusachs Collection."

106.  The original petition was signed and filed by "David Lingle, *in propria persona*". The first amended petition was signed and filed by "David Lingle (a.k.a. 'Cusachs'), *pro se*".

107.  Yet, on June 12, 2024 Defendants filed an exception alleging "The Petition is impermissibly vague and does not conform with the pleading requirements because it fails to put Defendants on notice regarding who or what is the plaintiff (*i.e.*, whether 'Cusachs' refers to persons or juridical persons) … 'Cusachs,' a vague and not clearly identified plaintiff".

108.  On January 15, 2025, Defendants filed another exception, claiming, "On March 6, 2024,

---

[29] There has never been any evidence put forth that the Cusachs family "story" that Barnett's brothers, Maurice and Louis, obtained his (Barnett's) 50% of the Collection. So, it should be discounted and determined that the transfer of Collection ownership from Philomene and Mary Cusachs to David Lingle, as trustee of the Elysian Fields Trust, was in 2015, as a byproduct of the judgment of possession in the succession of Philomene and Mary Cusachs.

[30] La CCP Art 1498 states, "The donation *inter vivos* shall in no case divest the donor of all his property; he must reserve to himself enough for subsistence. If he does not do so, a donation of a movable is null for the whole". Defendants' argument admits, Plaintiff's mother attempted to transfer "all her property to the Elysian Fields Trust". Defendants' Reply Brief, p. 5 (03/27/25).

Plaintiff, David Lingle, _on behalf of_ 'Cusachs,' *a fictitiously named plaintiff*, filed this suit against

Defendants," as if "Cusachs" was someone other than Plaintiff and that he had filed suit "_on behalf_

_of_" that someone other than himself. Defendants continued doing the same thing time and time

again, throughout *Cusachs v. State*, to mislead and distract the Parish Court and obstruct justice.

109.   Throughout *Cusachs v. State*, Defendants have created, signed, and filed a near-constant

stream of pleadings with knowingly-inaccurate and misleading facts and law (i.e., unlawfully-

altered and/or otherwise false facts and law), including matters as simple as who the plaintiff is

and what Louisiana statute and jurisprudence require to be in the title of a lawsuit.

110.   Defendants have created, signed, and filed argument to obstruct justice by overloading,

confusing, and misleading the Parish Court with unlawfully-altered and/or otherwise false facts

and law that were intended to antagonize, harass, and frighten Plaintiff and to also cause emotional

distress, mental anguish, unnecessary delay, and/or to needlessly increase the cost of litigation.

111.   For instance, in Defendants' *Cusachs v. State* Reply Memo, p. 5, fn. 5 (03/12/25):

> Mr. Lingle's use of this apparently assumed name "Cusachs" was and is legally
> improper. *See De Renzes v. His Wife*, 115 La. 675, 675, 39 So. 805, 805 (1905)
> (holding that requirement to use "name" in title of civil suit "means that the plaintiff
> shall bring suit in his *real name*; not in a fictitious name") (emphasis added);
> *Thompson v. Michelli*, 141 So. 466, 466 (La. 1932) (same).

112.   The Court should zero in on are the words "**in title of civil suit**" deceitfully added to

Defendants' citations. *De Renzes* and *Thompson* (supra) simply describe how, in the early 1900s,

Code of Practice Article 172 required that **_the petition_ "_must mention_"** (i.e., contain) the name

_and_ surname of the plaintiff. *De Renzes* and *Thompson* DO NOT opine _at all_ on the issue of what

must be in a case title. Defendants' citations are altered in manner to fraudulently deceive.

113. As another example, in Defendants' *Cusachs v. State* Post-Hearing Brief, p. 19-20

(06/02/25), Defendants' purposely misrepresented statute _again_ to the Parish Court. They argued:

> Any agreement for Elysian, Inc. purporting to transfer *all* the corporation's assets
> automatically and immediately upon acquisition to Lingle would be unlawful under

Louisiana and Wyoming law. *See* La RS § 12:1-640(c) (*corporation may not transfer all its assets to shareholder*); WY Stat § 17-16-640(c) (*same*). Lingle's assertion that the 2011 Meeting Minutes automatically funnel corporate assets to him lacks legal support.

114.   The Louisiana and Wyoming statutes above are virtually identical and are written to prohibit a corporation from distributing all its assets to shareholders ONLY *if and when the corporation would (a) not have the ability to pay its usual debts or (b) its total assets would be less than the sum of its total liabilities*. That statute ***does not*** prohibit a corporation from transferring any or all its assets to a shareholder, as Defendants allege. Defendants essentially defraud the Parish Court with their lack of judicial candor. Defendants' citation of statute above, representing that a "corporation may not transfer all its assets to shareholder", is just one more example of an endless chain of purposely-misleading and unlawful arguments that egregiously violate La CCP Arts 863-864.

### COUNT 1
### DEFAMATION[31]
### WITH CONSPIRACY TO DO THE SAME
### —against Misters Garner, Force, and Kottle, plus Sher Garner—

115.   Plaintiff incorporates here, in extenso, all other paragraphs of this complaint.

116.   Defendants have manufactured and published a series of false facts about Plaintiff.

117.   Defendants have relentlessly, falsely claimed that by filing *Cusachs v. State* and acting as its plaintiff, Plaintiff has criminally engaged in the practice of law (La RS 37:213-213.1).[32]

118.   Defendants have published negative statements about Plaintiff that were publicly put forth by Defendants as accurate facts and accused Plaintiff of premeditating, then, enacting the aforesaid crime of a non-lawyer practicing law. (See paragraphs 95-96 above).

119.   False statements of fact in Defendants' February 21, 2025 exception of no right of action:

---

[31] Defamation, count "1(a)"; Conspiracy to Commit Defamation, count "1(b)".
La CCP Art 2315, La CC 2324.

[32] La RS 37:213(C): "Any natural person who violates any provision of this Section shall be fined not more than one thousand dollars or imprisoned for not more than two years, or both."

a. On March 6, 2024, Plaintiff, David Lingle, on behalf of "Cusachs," a fictitiously named plaintiff, filed this suit against Defendants. [¶ 2]

b. On March 3, 2024—*three days before the filing of the Original Petition*—Elysian, Inc.'s board of directors supposedly convened to authorize Mr. Lingle to file this lawsuit in his individual capacity. [¶ 12]

c. Mr. Lingle filed this suit individually to circumvent Louisiana's prohibition on the unauthorized practice of law because, as a nonlawyer, he could not represent the interests of Elysian, Inc. [¶ 15]

d. Elysian, Inc.'s March 3, 2024 minutes constitute a paradigmatic example of an unlawful transfer of rights, including litigious rights, done solely to allow a nonlawyer, Mr. Lingle, to sue *pro se* on behalf of a corporation. [¶ 16]

e. In filing this lawsuit on behalf of and by an unlawful assignment from Elysian, Inc., Mr. Lingle has engaged in the unlawful practice of law. [¶ 17]

f. Mr. Lingle has produced documents demonstrating that he filed this lawsuit effectively on behalf of a juridical entity, Elysian, Inc., and that the corporation improperly transferred its rights to the Collection to Mr. Lingle for the sole purpose of circumventing the prohibition against corporations appearing *pro se* in litigation. [p. 1]

g. The Court should not countenance such a premeditated violation of its rules or the law. [p. 2]

h. On March 6, 2024, Mr. Lingle, on behalf of "Cusachs," a fictitiously named plaintiff, filed this suit against Defendants, alleging causes of action concerning the Collection [p. 2]

i. Elysian, Inc. Purportedly Assigned the Right to File This Lawsuit to Mr. Lingle Three Days Before He Filed It. [p. 8]

j. The board's minutes reveal, however, Elysian, Inc. supposedly transferred whatever rights it held in the Collection to Mr. Lingle solely to avoid having to hire a lawyer to file and represent it in this lawsuit. [p. 9]

120. False statements of fact in Defendants' June 2, 2025 post hearing brief:

a. Lingle claims ownership transferred to him in two phases: first, in 2011 or 2014, via the Elysian Fields Trust and, second, in 2023, when Cusachs Family Collection, LLC conveyed its 50% interest to Elysian, Inc. [p. 2]

b. Lingle, on behalf of "Cusachs," a fictitiously named plaintiff, filed this suit on March 6, 2024 against Defendants, alleging causes of action concerning the Collection. [p. 3]

c. Lingle changed course only "so that the expense of a lawsuit [would be] minimized, as much as possible." Exhibit 12, 2024 Meeting Minutes. [p. 14]

121. An examination of the alleged evidence underlying Defendants' own argument proves their claims are knowingly-factually false. Defendants did not have a reasonable basis to believe what they wrote in paragraphs 95-96 and 119-120 above. They publicly disseminated it to obstruct justice.

122. Defendants knew their stated facts were false and allegations of criminal behavior were

baseless, but they repeatedly stated them before the *Cusachs v. State* trier of fact to obstruct justice.

123.  Defendants published their false and defamatory claims about Plaintiff, maliciously, in bad faith, with actual malice, and a reckless disregard for the knowing falsity of their statements.

124.  Defendants knew their written statements had no basis in reality (factually or legally), but conspired to publicly distribute them anyway, while continuously ignoring facts that were counter to their claims. Defendants spewed their malicious misrepresentations to antagonize, humiliate, and embarrass Plaintiff in a manner that caused him severe emotional distress and mental anguish.

125.  Misters Garner, Force, and Kottle and Sher Garner conspired to publish and published their defamatory statements about Plaintiff to the Parish Court (including clerks), State representatives, and the general public by putting their claims in public records. As such, they openly and very widely published their defamatory statements in an unauthorized and unprivileged manner.

126.  Misters Garner, Force, and Kottle and Sher Garner abused their qualified privilege, as they knew their statements were false and even had uncontroverted evidence of the falsity of their statements. They acted with reckless disregard for the knowing falsity of their statements[33] and repeatedly re-published them anyway, even after being confronted with evidence of falsity.

127.  Since Defendants so-very-publicly published their defamatory statements, there is no way to fully retract or erase them from public view and scrutiny. As a result, Plaintiff is forever damaged and will suffer the consequences of Defendants' attacks for the rest of his life. Plaintiff feels humiliated and embarrassed about what Defendants have published. Plaintiff fears and is not only uneasy but quite frightened about the long-term consequences from Defendants' defamation.

128.  Defendants' acts of defamation are aggravated by bad faith[34] and proximately caused Plaintiff damages. For their defamation and bad faith, Defendants are liable, *in solido*, to Plaintiff for all damages, foreseeable or not … .

---

[33] Alternatively, in reckless disregard for the truth of the *actual* facts.
[34] La CC Art 1997.

**COUNT 2**
**FRAUD[35]**
**WITH CONSPIRACY TO DO THE SAME**
—**against Misters Garner, Force, and Kottle, plus Sher Garner**—

129.  Plaintiff incorporates here, in extenso, all other paragraphs of this complaint.

130.  Defendants took unlawful acts, including altering, misrepresenting, and suppressing the truth, with the intention of obtaining an unfair and improper legal advantage for themselves and the State, while getting paid hundreds of dollars an hour to do so on the State's behalf.[36] In order to enact their unlawful scheme, Defendants used mail and wire fraud and committed honest services fraud and/or conspired to do all those things in a manner that damaged Plaintiff.

131.  As a part of conspiring with and assisting the State to essentially steal Plaintiff's property and/or the dollar value of that property,[37] Defendants (a) concealed and withheld public records to prevent Plaintiff from gathering evidence to prove his *Cusachs v. State* claims, (b) pled, published, distributed, and argued false facts and law and defamed Plaintiff[38] to knowingly misrepresent matters, mislead the Parish Court, and fraudulently obstruct and attempt to derail justice.

132.  Defendants' acts and conspiracy to (a) conceal and withhold public records from Plaintiff and (b) plead, publish, distribute, and argue false facts and law and defame Plaintiff were all part of a scheme to gain money and Plaintiff's property by stymying his recovery of it from the State.

133.  Plaintiff's relationship with the State is a special relationship, a fiduciary relationship, and

---

[35] Mail Fraud, count "2(a)", Conspiracy to Commit Mail Fraud, count "2(b), Honest Services Mail Fraud, count "2(c)", Conspiracy to Commit Honest Services Mail Fraud, count "2(d)"; Wire Fraud, count "2(e)", Conspiracy to Commit Wire Fraud, count "2(f)", Honest Services Wire Fraud "2(g)", Conspiracy to Commit Honest Services Wire Fraud, count "2(h)".
18 USC §§ 1341, 1343, 1346, 1349. [Alternatively, La CCP Art 1953, La CC 2324.].
[36] Defendants used postal, commercial, and private mail and email, internet upload/download, telephone/cellphone, and other electronic delivery means to accomplish their unlawful deeds.
[37] Defendants did so, while making money by billing the State hundreds of dollars an hour to enact their fraudulent scheme to take Plaintiff's property or the dollar value of that property.
[38] The false (i.e., fake) facts and law, plus defamatory writings of Defendants, were part of a scheme to use misrepresentations and omissions to obtain an unfair and improper legal advantage.

the State's representatives have misused their position of trust and authority for personal gain.[39] Defendants have been and are conspiring and assisting the State to defraud Plaintiff and, by doing so, are depriving him of his intangible right to honest services.

134.  Defendants' acts of fraud are aggravated by bad faith and proximately caused Plaintiff damages. For their fraud and bad faith, Defendants are liable, *in solido*, to Plaintiff for attorney fees, litigation costs, and all damages, foreseeable or not … .

**COUNT 3**
**OBSTRUCTION OF JUSTICE[40]**
**WITH CONSPIRACY TO DO THE SAME**
**—against Misters Garner, Force, and Kottle, plus Sher Garner—**

135.  Plaintiff incorporates here, in extenso, all other paragraphs of this complaint.

136.  Defendants' unlawful "antics", as detailed herein above were part of an intentional, very-calculated scheme and conspiracy to obstruct justice, which included attorneys and violated La CCP Art 863-864, the Rules for Louisiana District Courts, the American Bar Association and Louisiana Bar Association Rules of Professional Conduct, and were also, effectively, a civil violation of numerous criminal statute, such as RS 14:130.1(A)(1)(a-b) (obstruction of justice), 14:132 (injuring public records), 14:133 (filing or maintaining false public records), 14:133.1 (obstruction of court orders), and 14:134 (malfeasance in office).

137.  Defendants' law license is not a license that permits ignoring Public Records Law or that allows them to assist the State to steal from Plaintiff, defraud Plaintiff, defame Plaintiff, or write

---

[39] The State's representatives sought to gain personal advantages by being "yes men," so that they would be viewed in their job capacity as a good protector of the State, DCRT, OSM, and LSM—with each of the individuals involved expecting to, ultimately, receive recognition and better job security, opportunities, and pay as a result. Misters Garner, Force, and Kottle, in addition to the firm of Sher Garner, also sought and obtained personal gain in the form of recognition and significant cash compensation for helping the State steal from, defraud, and defame Plaintiff.

[40] Obstruction of Justice, count "3(a)"; Conspiracy to Obstruct Justice, count "3(b)". La CCP Art 2315, CC Art 2324. Also see RS 14:130.1(A)(1)(a-b), 14:132, 14:133, 14:133.1 and 14:134.

knowingly-false facts and law in pleadings to obstruct justice and prevent Plaintiff from recovering his property and/or the dollar value of his property. Attorneys must obey the law too.

138.  Defendants' acts to obstruct justice are aggravated by bad faith and proximately caused Plaintiff damages. For their obstruction of justice, Defendants are liable, *in solido*, to Plaintiff for attorney fees, litigation costs, and all damages, foreseeable or not … .

**COUNT 4**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS[41]**
**WITH CONSPIRACY TO DO THE SAME**
**—against Misters Garner, Force, and Kottle, plus Sher Garner—**

139.  Plaintiff incorporates here, in extenso, all other paragraphs of this complaint.

140.  Defendants had a duty—pursuant to codal, statutory, administrative and local laws, as well as a private contract and general custom—to act with care and not do the damaging things they have done to Plaintiff. (In some instances, the damage caused was negligent. In others, the damage caused was knowing and intentional.) That duty included a responsibility to ensure they did not act with the wonton recklessness they have, which has ultimately caused a virtually-unmanageable flow of litigation for Plaintiff and the Court.

141.  Defendants' conduct, with that of their co-conspirators (the State) did not conform to appropriate standards. Defendants' substandard conduct was the legal cause of injury to Plaintiff.

142.  Defendants' actions have egregiously violated Plaintiff's *and society's* sacrosanct trust in government to do the right moral, ethical, and legal things and belief that the State—and the very people within it who prosecute citizens (such as the DOJ) for doing what Defendants have been doing—has a role in setting standards for society's behavior.

143.  Defendants categorically knew or should have known that their actions on behalf of and with

---

[41] Negligent Infliction of Emotional Distress "11(a)"; Conspiracy to Commit Negligent Infliction of Emotional Distress, count "11(b)". La CCP Art 2315, CC Art 2324.

**37** of **41**

the State would cause severe mental anguish, emotional distress, embarrassment and humiliation.

144.  Defendants' acts to cause negligent infliction of emotional distress proximately caused Plaintiff damages. For their negligent infliction of emotional distress, Defendants are liable, *in solido*, to Plaintiff for litigation costs, and all damages, foreseeable or not … .

**COUNT 5**
**VIOLATION OF LOUISIANA PUBLIC RECORDS LAW[42]**
**WITH CONSPIRACY TO DO THE SAME**
**—against Misters Garner, Force, and Kottle, plus Sher Garner—**

145.  Plaintiff incorporates here, in extenso, all other paragraphs of this complaint.

146.  Defendants have been conspiring with and assisting the State to conceal and withhold public records, in an attempt to hide the State's reckless care for Plaintiff's property (i.e., the Collection)[43] and effectively steal Plaintiff's property and/or the dollar value of that property.

147.  Defendants violated Louisiana Public Records Law, and/or conspired with the State to do so, through an unreasonable, arbitrary and capricious failure to respond to public records requests and concealment/withholding of public records.

148.  Defendants' acts to violate Louisiana Public Records Law are aggravated by bad faith and proximately caused Plaintiff damages. For their violation of Louisiana Public Records Law and bad faith, Defendants are liable, *in solido*, to Plaintiff for attorney fees, litigation costs, and all damages, foreseeable or not … .

---

[42] Violation of Public Records Law, "4(a)"; Conspiracy to Violate Public Records Law, "4(b)". La RS 44:31(A), 44:32(A), 44:33(B)(1), and 44:34, La CC 2324.

[43] Along with the roughly 4.5 million artifacts that have been sold, destroyed, stolen, or otherwise lost since 1972—all while the State Museum is now in the middle of an American Alliance of Museums accreditation process and has made misrepresentations that it (a) complies with local, state, and federal laws, (b) is committed to public accountability and is transparent in its operations, and (c) legally and ethically carries out its responsibilities for managing, documenting, caring for, and using collections, such as Plaintiff's.

## COUNT 6
## VIOLATION OF RICO ACT[44]
## WITH CONSPIRACY TO DO THE SAME
### —against Misters Garner, Force, and Kottle—

149.  Plaintiff incorporates here, in extenso, all other paragraphs of this complaint.

150.  Sher Garner, the State, and the DCRT are each entities that fit the legal definition of an "enterprise". 18 USC § 1961(4). See also La RS 15:1352(B).

151.  Misters Garner, Force, and Kottle are each natural-born individuals that fit the definition of a "person". 18 USC § 1961(3).

152.  Misters Garner, Force, and Kottle's unlawful, conspiratorial acts described herein above fit the definition of a "racketeering activity".[45]

153.  Within the last two years, Misters Garner, Force, and Kottle took acts more than twice that fit the definition of "racketeering activity",[46] which constitutes a "pattern of racketeering activity".[46]

154.  Within the last two years and through a "pattern of racketeering activity", Misters Garner, Force, and Kottle maintained, directly or indirectly, interest in and control of Sher Garner, which is engaged in and has activities affecting interstate commerce.[47]

155.  Within the last two years, Misters Garner, Force, and Kottle—who own and are employed by Sher Garner (an "enterprise" engaged in and has activities affecting interstate commerce)—conducted or participated, directly or indirectly, in the conduct of Sher Garner's affairs through a pattern of racketeering activity. 18 USC § 1962(c) [La RS 15:1353(C)].

---

[44] Violation of RICO Act, count "5(a)"; Conspiracy to Violate RICO Act, count "5(b)".
18 USC §§ 1962, 1349 [alternatively, Violation of La Racketeering Act, La RS 15:1353].

[45] 18 USC § 1961(1) and 18 USC §§ 1341 (mail fraud), section 1343 (wire fraud), section 1346 (honest services fraud) [La RS 15:1352(A) and La RS 15:1352 (37) RS 14:67 (theft), (67) RS 14:132 (injuring public records), (68) RS 14:133 (filing or maintaining false public records, (69) R.S. 14:134.3 (Abuse of office)].

[46] 18 USC § 1961(1), (5) [La RS 15:1352(C)].

[47] 18 USC § 1962(b) [La RS 15:1353(B)]

156.  Within the last two years, defendant-Misters Garner, Force, and Kottle conspired to violate the provisions of 18 USC § 1962(a-c) [La RS 15:1353(A-C)].[48]

157.  The scheme employed by Misters Garner, Force, and Kottle used Sher Garner and a pattern of racketeering activity that included mail fraud, wire fraud, honest services fraud, and obstruction of justice,[49] by conspiring with and assisting the State to steal from Plaintiff, defraud Plaintiff, defame Plaintiff, and write knowingly false facts and law in pleadings as a means to obstruct justice to prevent Plaintiff from recovering his property and/or the dollar value of his property.

158.  The acts of defendant-Misters Garner, Force, and Kottle to violate the RICO Act and Louisiana Racketeering Act are aggravated by bad faith and proximately caused Plaintiff damages. For their violation of the RICO Act and Louisiana Racketeering Act, they are liable, *in solido*, to Plaintiff for attorney fees, litigation costs, and threefold the damages (all damages, trebled) … .

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that Defendants be duly cited and served with process of this Complaint for Damages, and, after all legal delays and due proceedings, and a verdict in Plaintiff's favor, that the Court enter a final judgment in favor of Plaintiff and against Defendants, *in solido*, each individually *and* in their official capacities, to pay him just compensation, full restitution, and complete reparation (all damage), foreseeable or not, related to, but not limited to, the full dollar value of the artifacts that have been taken, not returned, or damaged (just compensation to the full extent of his loss), the damage from the loss of and damage to Plaintiff's property and the delays caused by Defendants improper acts, including the opportunity cost of Plaintiff not being able to use his property (including money) to do the things he wanted to with it

---

[48] 18 USC § 1962(d) [La RS 15:1353(D)].

[49] The acts also violated La RS 15:1353 by violating La RS 15:1352 (37) RS 14:67 (theft), (67) RS 14:132 (injuring public records), and (68) RS 14:133 (filing or maintaining false public records).

when he wanted to do it and the opportunity cost of Plaintiff's past, current, and future time, energy, and money spent dealing with Defendants' improper acts, in addition to compensation for damage to his name, reputation, and image (reputational and economic harm), inconvenience, mental anguish, emotional distress, embarrassment and humiliation, investigation expenses, appraisal expenses, and expert witness expenses, in addition all legal interest due, attorney fees (pursuant to any fee contract Plaintiff has with attorneys), and litigation costs.

Plaintiff prays the Court orders each of the named defendants to publicly retract their defamatory or otherwise false statements.

Plaintiff also prays for threefold/treble damages and punitive/exemplary damages.

Plaintiff lastly prays the Court orders any other relief it deems to be equitable or otherwise proper, so that just compensation, full restitution, and complete reparations are made to Plaintiff.

## RESERVATION OF RIGHTS TO TRIAL BY JURY

Plaintiff hereby reserves his right to trial by jury of all issues so triable in this action.

Respectfully submitted, under penalty of perjury,

David Lingle ("Cusachs"), *pro se*
3948 3rd St. S, #268, Jax Bch, FL 32250
Ph: (904) 916-7100 || LingleDavid@gmail.com